**Opinion issued May 8, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00051-CV

————————————

## IN RE T.E.G. AND E.A.G., CHILDREN

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-06997J**

---

## MEMORANDUM OPINION

Appellant, P.M., challenges the trial court's termination of her parental rights to her children, T.E.G. and E.A.G. In three issues, P.M. argues that the evidence was legally and factually insufficient to support the trial court's findings that (1) she endangered her children, as required for termination under Texas Family Code section 161.001(1)(E); (2) the children were removed as a result of

neglect or abuse and she failed to comply with provisions of a court order, as required for termination under section 161.001(1)(O); and (3) termination of her parental rights was in the children's best interest.

We affirm.

## Background

P.M. is the mother to T.E.G., born May 27, 2008, and E.A.G., born October 2, 2009. P.M. first became involved with the Department of Family and Protective Services ("DFPS") in December 2010, when DFPS received a referral alleging neglectful supervision of T.E.G. and E.A.G. by P.M. and physical abuse of T.E.G. by an unknown perpetrator. The report stated that police made contact with P.M. and T.G., the children's father, and observed E.A.G. with "an ashtray in his mouth" and noted that ashes smelling of burnt marijuana "covered his mouth and face." The report also stated that T.E.G. "was observed with a swollen nose with discoloration and a scab that appeared to be several days old, and bruising under the eyes." P.M. stated that she thought T.E.G. had fallen off a bed two days previously, but she was not sure what had caused his injuries. That referral was closed with findings that neither of the children had been harmed while in P.M.'s care and that the injury to T.E.G. "was described as an accident by all principals."

In August 2011, DFPS received another referral when P.M. was seen slapping E.A.G. on the head and neck area three or more times. P.M. had brought

E.A.G. with her for a court appearance, E.A.G "had been crying all day long," and the judge asked P.M. to leave the courtroom with the child. P.M. reportedly "dragged the child into the next room while escorted by the Bailiff and then hit the child" on the head and neck several times. DFPS was unable to complete its review of this referral because it was not able to locate the family. However, P.M. was subsequently arrested for injury to a child by causing intentional bodily injury.

In June 2012, DFPS received a third referral alleging physical abuse of E.A.G. The report stated that medical staff examining E.A.G. at a doctor's office discovered a second degree burn on his lower right leg, and P.M. refused to explain how E.A.G. had been burned. The medical staff also noted scars on T.E.G.'s back and right arm.

DFPS was not able to locate P.M. until December 2012. At that time, E.A.G.'s burn had healed, and both children appeared well-groomed and were in good health. P.M. told the DFPS caseworker that while she was ironing on the floor, E.A.G. tripped and was burned as a result. She further stated that, contrary to the report from the medical staff, she had taken E.A.G. to the doctor's office expressly for the purpose of having the burn treated. P.M. told investigators that she refused to answer the medical staff's questions because she was frustrated with their apparent assumption that she had injured her child intentionally.

DFPS subsequently interviewed T.E.G., who was four years old at the time, and he indicated that there were instances of domestic violence occurring in his home: he stated that he had seen his father hit his mother and that she fought back. T.E.G. also stated that his father had a gun and had threatened the family with it, but it was unclear when this event occurred.

DFPS asked P.M. to submit to a drug test, and P.M. acknowledged that she had recently used marijuana. On December 14, 2012, she tested positive for marijuana and cocaine, and the children were taken into DFPS custody on December 17, 2012. The clinician who conducted the family investigation reported that P.M. denied using cocaine, but she admitted that she took Xanax and other un-named pills on a weekly basis. P.M. also reported to the clinician that she used marijuana every other day.

During the family investigation, P.M. also provided information about her background. P.M. told the investigator that she was expelled from school in the tenth grade for truancy and fighting and that she had lived on her own since she was sixteen years old. P.M. also stated that she was involved with a gang from the time she was fifteen years old until she was twenty years old. P.M. disclosed that she had struggled with depression and that she took medications that were not prescribed to her to treat the condition. She likewise disclosed that she took medication for pain related to her scoliosis that had not been prescribed to her.

P.M. was evicted from her apartment following a domestic disturbance with T.G. and then lived for a time with her mother. P.M. stated that she was not avoiding DFPS during this time and claimed that the caseworker was looking for her at the old address. P.M. stated that she was unemployed and that she received $710 each month in social security disability payments because she has ADHD and scoliosis, and she received $589 per month in food stamps.

On February 26, 2013, DFPS filed a family service plan with the trial court. The plan was based on notes taken during a family conference, which P.M. and her attorney both attended. The plan indicated concerns such as the young age of the children, who were both under five years old, and the criminal history of both parents. The plan required P.M., among other things, to obtain and maintain stable employment, participate in a trade school or obtain a GED, complete a psychiatric evaluation and comply with related recommendations, participate in random urinalysis drug testing, complete a drug and alcohol assessment and follow all related recommendations, complete parenting classes, and participate in therapy. That same day, the trial court entered an order incorporating the family service plan and warning P.M. that failure to comply with the plan might result in termination of her parental rights.

The case proceeded to trial on December 12, 2013. The DFPS caseworker, Christina McKinney, testified that T.E.G. and E.A.G. had been living in a foster

5

home for the past year and that the foster parents were willing to adopt the children. McKinney testified that the children had come into DFPS's care based on the allegation of abuse relating to the burn on E.A.G's leg and that P.M. had admitted to having a drug problem. McKinney testified that DFPS provided P.M. with a family service plan but she failed to complete the plan. Specifically, P.M. had been unsuccessfully discharged from individual counseling and from her substance abuse treatment program. She also failed to obtain and maintain stable employment and housing. McKinney testified that P.M. had tested positive for drug use "throughout this case."

McKinney recommended termination of P.M.'s parental rights because she did not complete her family service plan. She testified that, due to their young age, the children needed a "stable home that can be clean of drugs and provide them a safe environment" and that P.M. "is not able to do that." McKinney also testified that, despite evidence that P.M. had a clean drug test the month before trial, she still had grave concerns about P.M.'s drug use because she had failed to complete her substance abuse services.

McKinney acknowledged that P.M. had been visiting the children since their removal from her custody and that the children missed P.M. McKinney also acknowledged that she did not have any direct proof that P.M. had physically assaulted the children, that she had ever used drugs in the presence of the children,

6

or that the children had ever been harmed or endangered by P.M.'s drug use. McKinney also admitted that at the time the children were removed from P.M.'s care, the DFPS caseworker reported that their home was clean and that the children were clean, healthy, and appeared developmentally normal with no visible marks or bruises. McKinney testified that the children "state they do miss their mother but they also state they are happy in their foster home."

McKinney also testified that at one point, DFPS had placed the children with P.M.'s sister. P.M.'s sister had passed a home study and had been given custody of the children for some period of time after DFPS removed them from P.M.'s care. However, McKinney testified that the children were removed from that home because P.M.'s sister allowed the children to have contact with people who had drug and criminal histories. She told the trial court that when the children were removed from P.M.'s sister's home, their first question was whether they could return to their foster family. McKinney stated that this indicated a bond between the children and their foster family.

A drug testing expert, Bruce Jeffries, testified regarding P.M.'s multiple drug tests. He recounted her numerous positive drug tests. On December 20, 2012, P.M. tested positive for ingestion of cocaine and marijuana. Jeffries testified that her test results indicated that she had ingested cocaine within the last three days of taking the test. On February 26, 2013, P.M. again tested positive for high

7

levels of cocaine, indicating "every day use" of the drug. She also tested positive for hydrocodone. On May 23, 2013, P.M. tested positive for methamphetamine. Her August 15, 2013 test was "positive for ingestion of cocaine" and for marijuana. He testified that it takes approximately 90 days for drug tests to appear clear once someone quits using drugs, so these results indicated P.M. had used the drugs in question on more than one occasion.

On September 17, 2013, P.M.'s urine test was clear, but the results of the hair follicle test indicated similar levels of cocaine and marijuana use as the previous test. Jeffries admitted that these results could indicate that P.M. had quit using drugs or had lessened her drug use. Finally, Jeffries testified that P.M.'s November 21, 2013 test was "clean." Specifically, he testified that the results impressed him because her earliest levels of cocaine usage were very high, indicating that she was an addict, and that she had reduced her levels to "zero." He testified that such results were very rare. He also testified that the results could not have been due to tampering and he stated, "I'm impressed. She's clean today as we sit here. So either she came to Jesus or something, cause she's—I'm shocked."

At trial, DFPS presented evidence of P.M.'s criminal history, which included the following: a 2002 conviction for assault causing bodily injury; two theft convictions in 2005 and 2006 that resulted in two days' confinement; a 2010 conviction for failing to identify herself to a police officer and giving false

8

information that resulted in five days' confinement; a 2011 conviction for assault causing bodily injury that resulted in a sentence of sixty days' confinement; and a 2011 conviction for injury to a child related to her treatment of E.A.G., which resulted in 180 days' confinement.

T.G., the children's father who at least occasionally lived with the children, also had a lengthy criminal history including convictions for marijuana possession, theft, robbery, and assault.[1]  P.M. also testified that T.G. "does tattoos and sells marijuana."  She told a caseworker during the investigation that she had not had any further contact with T.G. following the domestic disturbance in 2012.  The children's maternal grandmother, with whom the children also occasionally lived, had seven previous convictions for theft, forgery, and credit card abuse.  DFPS also presented numerous reports and other documentation relating to its previous investigation that were admitted into evidence, including reports that mentioned T.E.G.'s interview, in which he claimed to have witnessed domestic violence between his father and mother, and P.M.'s statements to investigators regarding the family's eviction from their apartment following the 2012 domestic disturbance incident.

P.M. testified that she completed school through the tenth grade and that she has disabilities—ADHD and scoliosis—that prevent her from working.  She

---

[1]    The trial court also terminated T.G.'s parental rights to the children.  However, he is not a party to this appeal.

9

testified that she receives $710 per month in social security disability payments and that she received food stamps when the children were in her care. She testified that she was able to clothe, house, and feed her children with the assistance she received. P.M. also testified that the children were well-cared for prior to their removal by DFPS.

P.M. again stated that the burn E.A.G. received on his leg was the result of an accident that occurred while she was ironing. She testified that she took him to the doctor to have the burn treated. P.M. also testified that she had completed all of the tasks in her family service plan "to the best of [her] ability" and that she had cooperated with DFPS. She stated that she wanted the children to come live with her again and that the children had expressed to her the desire to live with her. Alternatively, she thought her sister's home would be an appropriate placement for the children.

P.M. acknowledged at trial that she used marijuana and "mollies," which she described at trial as containing ecstasy and cocaine, at the time the children were removed from her care and that she had used the drugs both before and after the children's removal. She stated that she had never used drugs around the children and that she only used drugs on the weekend at parties.

She also admitted that she had pled guilty to assaulting a neighbor in 2011 and was confined in the Harris County Jail as a result. She further admitted that

10

she had pled guilty to assaulting E.A.G. and spent 180 days confined in state jail for that offense. She also acknowledged that she continued to use drugs "[a] little bit after" DFPS removed her children from her care. She stated that she had an opportunity to complete her service plan, but she admitted that she failed to complete all of it.

The trial court terminated P.M.'s parental rights pursuant to Family Code subsections 161.001(1)(E) and (O). This appeal followed.

### Termination of Parental Rights

In three issues, P.M. argues that the trial court erred in terminating her parental rights to T.E.G. and E.A.G. because the evidence was legally and factually insufficient to support termination on the grounds found by the trial court.

**A.     Standard of Review**

In a case to terminate parental rights brought by DFPS under section 161.001, DFPS must establish, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (Vernon 2014); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of

11

the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

In conducting a legal-sufficiency review in a parental-rights-termination case under Family Code section 161.001, we must look at all the evidence to determine whether the evidence viewed in the light most favorable to the finding is such that a reasonable factfinder could have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *In re J.O.A.*, 283 S.W.3d at 344 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*; *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

In conducting a factual-sufficiency review, we view all of the evidence, including disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d at 345. We should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The evidence is factually insufficient only if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

reasonably have formed a firm belief or conviction" regarding the finding under review. *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

DFPS must establish both elements—that the parent committed one of the acts or omissions enumerated in section 161.001(1) and that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001; *In re C.H.*, 89 S.W.3d at 23. Termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). However, "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of parental rights. *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.); *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.).

## B.     Termination Under Section 161.001

Family Code section 161.001(1) identifies multiple grounds for involuntarily terminating parental rights. TEX. FAM. CODE ANN. § 161.001(1); *In re E.C.R.*, 402 S.W.3d 239, 243 (Tex. 2013). The trial court terminated P.M.'s parental rights based on findings made pursuant to subsections 161.001(1)(E) and (O).

### 1.    *Subsection 161.001(1)(E)*

Subsection E provides that a parent's rights can be terminated when she has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."  TEX. FAM. CODE ANN. § 161.001(1)(E).

"Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act."  *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also Jordan*, 325 S.W.3d at 723 ("The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being.").  In this context, endanger means "to expose to loss or injury; to jeopardize."  *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (quoting *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)).  A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.  *Jordan*, 325 S.W.3d at 721; *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

Termination under subsection 161.001(1)(E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent.  *Jordan*, 325 S.W.3d at 723; *In re*

14

*J.T.G.*, 121 S.W.3d at 125. "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*, 180 S.W.3d at 383 (citing *In re M.C.*, 917 S.W.2d at 269); *see also In re J.O.A.*, 283 S.W.3d at 345 (holding that endangering conduct is not limited to actions directed toward child); *Jordan*, 325 S.W.3d at 723 (holding that danger to child need not be established as independent proposition and may be inferred from parental misconduct even if conduct is not directed at child and child suffers no actual injury). Danger to the child's well-being may be inferred from parental misconduct alone, and courts may look at parental conduct both before and after the child's birth. *See In re J.O.A.*, 283 S.W.3d at 345. The conduct need not occur in the child's presence, and it may occur "before the child's birth and both before and after the child has been removed [from the home] by the Department." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child. *Jordan*, 325 S.W.3d at 724. Furthermore, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345; *see also In re T.N.*, 180 S.W.3d at 383 ("A parent's engaging in

15

illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children."). Illegal drug use may support termination under subsection 161.001(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned. . . ." *Walker*, 312 S.W.3d at 617.

Here, the evidence demonstrates P.M.'s use of illegal drugs both before and after the children were removed from her care and a pattern of criminal conduct. At the time T.E.G. and E.A.G. were removed from her care, P.M. acknowledged that she would test positive for marijuana. She repeatedly tested positive for cocaine and marijuana use, including several drug tests administered after the children were removed from her care. *See Walker*, 312 S.W.3d at 617 (holding that illegal drug use can support termination under 161.001(1)(E)); *In re T.N.*, 180 S.W.3d at 383 (stating that drug use after agreeing not to in service plan indicates course of endangering conduct). P.M. also acknowledged at trial that she had pled guilty to assaulting E.A.G. in 2011, and DFPS presented evidence of that conviction.[2] *See Jordan*, 325 S.W.3d at 724 ("Abusive and violent criminal

---

[2] P.M. argues on appeal that the only evidence of the assault against E.A.G. was provided through an affidavit of a DFPS caseworker that the trial court excluded and therefore was not admitted into evidence. However, the record included numerous references to this assault, including P.M.'s own testimony at trial and

conduct by a parent can produce an environment that endangers the well-being of a child."). DFPS also presented evidence of P.M.'s 2011 conviction for assault of a neighbor, in addition to several other prior convictions.

The record also demonstrated that the children had lived occasionally with T.G., who has a lengthy history of criminal convictions and who occasionally sold marijuana. P.M. and the children were evicted from their apartment following a domestic disturbance in 2012 and had gone to live with P.M.'s mother, who also has a criminal history. *See id.*

Thus, we conclude that the evidence was legally sufficient to support termination under subsection 161.001(1)(E). *See In re J.O.A.*, 283 S.W.3d at 344.

P.M. argues that her last blood test was completely clean and that she never exposed T.E.G. or E.A.G. to any drug use. However, P.M.'s drug use need not have been conducted in the children's presence for it to have had a negative effect on her ability to parent. *See In re J.O.A.*, 283 S.W.3d at 345; *Walker*, 312 S.W.3d at 617 (holding that endangering conduct need not occur in child's presence and may occur both before and after child has been removed). Furthermore, the trial court, as factfinder, was the sole arbiter of the credibility of the witnesses. *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). In light of the evidence of P.M.'s ongoing drug use and failure to complete her substance abuse treatment,

the report filed by the clinician who completed the family interview after DFPS removed the children from P.M.'s care.

17

the trial court was not required to believe her assertions that the children were not exposed to drug use. Nor was the trial court required to conclude that P.M. had adequately addressed her drug abuse issues in light of a single negative drug test. *See In re J.O.A.*, 283 S.W.3d at 346–47 (holding that conflicting evidence, such as evidence of parent's "recent improvements," is properly part of factual sufficiency review and stating, "While the recent improvements made by [the parent] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices").

P.M. also argues that there was no evidence that she had physically injured her children or that her drug use had harmed them in any way. The record does not support her contention. Although P.M. contends that she did not harm her children, she acknowledged that she had pled guilty to injury to her child, E.A.G. In addition, there was evidence from which the factfinder could conclude that she had harmed the children, including evidence that P.M. used drugs before and after the children were removed and evidence of incidents of domestic violence occurring in the home. We hold that the evidence was legally and factually sufficient to support the trial court's termination of P.M.'s parental rights pursuant to section 161.001(1)(E). *See In re J.O.A.*, 283 S.W.3d at 344–45. Accordingly, we do not need to determine whether the evidence was sufficient to support

18

termination under section 161.001(1)(O). *See In re A.V.*, 113 S.W.3d at 362 (holding that trial court only needs to make one finding of parental misconduct under Family Code section 161.001(1)).

We overrule P.M.'s first and second issues.

## 2. *Best Interest of the Children*

In her third issue, P.M. argues that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest.

There is a strong presumption that the best interest of the children will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2014). The Family Code and the Texas Supreme Court have both set out numerous factors to be considered in determining a child's best interest, including, among others: the child's age and physical and mental vulnerabilities; the child's desires; the magnitude, frequency, and circumstances of harm to the child, including current and future danger to the child; whether there is a history of substance abuse by the child's family; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's

close supervision; whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with minimally adequate health and nutritional care, guidance and supervision, and a safe physical home environment; the stability of the home or proposed placement; and the parent's acts or omissions indicating an improper parent-child relationship and any excuses for the acts or omissions. *See id.* § 263.307(b); *In re R.R.*, 209 S.W.3d at 116; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d at 27. The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *Id.* at 28; *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). Furthermore, the best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *See In re N.R.T.*, 338 S.W.3d at 677.

Here, multiple factors support the trial court's finding that termination was in the children's best interest. T.E.G. and E.A.G. were five years old and four years old, respectively, at the time of trial. McKinney testified that due to their young age, the children needed a "stable home that can be clean of drugs and

20

provide them a safe environment" and that P.M. "is not able to do that." She based this recommendation on the fact that P.M. continued to abuse drugs even after her children were removed and failed to complete her family service plan, including the requirement that she complete substance abuse treatment. *See In re E.C.R.*, 402 S.W.3d at 249 (holding that findings under section 161.001(1)(O) that parent failed to complete services can support best interest finding).

There was also evidence of endangering conduct by P.M. and instability and drug use in the children's home. The evidence demonstrated that the children were removed from P.M.'s care because she tested positive for drug use. DFPS also presented evidence that P.M. pled guilty to assaulting E.A.G. and that she had committed other criminal acts that had resulted in her confinement in the Harris County Jail on several occasions. DFPS likewise presented evidence that following two reports of abuse—the 2011 referral for the assault on E.A.G. and the 2012 referral regarding the burn on E.A.G.'s leg—it had a difficult time contacting P.M. because the family could not be located. The reports admitted by DFPS during the trial also recounted T.E.G.'s statement during an interview that his father had hit his mother and she had fought back. The children's father, T.G., who had sometimes lived in the children's home, has an extensive criminal history. There was also evidence that P.M. and the children were evicted from an apartment on one occasion as a result of a domestic disturbance involving T.G. P.M.'s

21

mother, with whom the children had also occasionally lived, also has a criminal history. *See* TEX. FAM. CODE ANN. § 263.307(b) (providing courts should consider child's age and vulnerabilities, circumstances of harm, history of substance abuse, willingness to complete services, demonstration of parenting skills, and safety of physical home environment); *Holley*, 544 S.W.2d at 371–72 (providing that courts should examine stability of home and proposed placement and parent's acts or omissions indicating improper relationship).

Regarding the children's placement at the time of trial, McKinney testified that, although they missed their mother, they were happy in the foster home. McKinney also testified that the foster family was approved for adoption and wished to adopt T.E.G. and E.A.G. She also testified that the children appeared to have a bond with their foster family.

Thus, the evidence was legally sufficient to support the trial court's finding that termination of P.M.'s parental rights was in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 344.

P.M. argues that desires of the children weigh against terminating her parental rights. She testified that the children had told her that they wanted to live with her and did not want to live with anyone else. However, because the children were four and five years old at the time of trial, the consideration of their desires does not carry the same weight as would the desires of older children. *See In re*

*A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("The young age of the child rendered consideration of the child's desires neutral."). Furthermore, McKinney testified that the children were happy in their foster home and that they appeared bonded to their foster family.

P.M. also argues that she met the children's emotional and physical needs. She points to evidence that the children were healthy and well-nourished, and she argues that there was "no evidence that E.A.G. and T.E.G. were ever in danger or would be in the future if placed back in the home with [P.M.], or, in the alternative, with [P.M.'s] sister." She also argued that she provided a safe and stable home for the children. However, these arguments disregard the evidence of P.M.'s plea of guilty to assaulting E.A.G., P.M.'s history of being difficult to locate during DFPS's investigation of the 2011 and 2012 referrals, and the negative effect of drug use and criminal activity on the children's living conditions. *See Jordan*, 325 S.W.3d at 724 ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child."); *Walker*, 312 S.W.3d at 617 (holding that "[e]vidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future" and that "[c]onduct that routinely subjects a child to the probability that the child will be left alone because a parent is jailed endangers both the physical and emotional well-being of the child"); *In re T.N.*, 180 S.W.3d at 383 ("A parent's

23

engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children.").

Furthermore, McKinney testified at trial that the children had been placed with P.M.'s sister at some point after DFPS removed them from P.M.'s care. However, the children were removed from that placement because the sister allowed the children to be around people who had problems with criminal activity and drug use. The evidence also demonstrated that P.M. had been confined on more than one occasion because of her own criminal activity, that she and the children had been evicted from one apartment due to a domestic disturbance, and that the children had also lived with people, such as T.G. and P.M.'s mother, who have a history of criminal activity. This is in contrast to the evidence demonstrating that the foster home where the children had lived for almost one year was stable and that the foster parents wished to adopt T.E.G. and E.A.G.

Finally, P.M. argues that "there was no evidence to indicate that the existing parent-child relationship . . . was improper" except for her "use of drugs on the weekends, out of the presence of her children." She testified that she had stopped using drugs, and she and McKinney both testified that she continued to visit the children. P.M. testified that she cooperated with DFPS and completed her family

24

service plan to the best of her ability. However, McKinney testified that P.M. had failed to complete her substance abuse treatment and other aspects of the family service plan. McKinney testified that, in light of that failure, she did not believe that P.M. had adequately recovered from her substance abuse issues.

Thus, we conclude that the evidence was both legally and factually sufficient to support the trial court's finding that termination was in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 344–45.

We overrule P.M.'s third issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Brown.